**U.S. Department of Justice**

National Institute of Corrections



# Staff Perspectives

## SEXUAL VIOLENCE IN ADULT PRISONS & JAILS

### PRISON RAPE ELIMINATION ACT

July 2007, Volume 2

# Investigating Sexual Assaults in Correctional Facilities

**Message From the Director**

The Prison Rape Elimination Act (PREA) of 2003 charged the National Institute of Corrections (NIC) with the responsibility of assisting the corrections field in addressing the problem of sexual violence. A key element of NIC's assistance has been increasing our knowledge about the current barriers to preventing and responding to sexual violence and developing blueprints for change. While it is important to solicit the views of various experts, it is equally important to understand the issue from the perspective of correctional staff. Realizing this, NIC decided early in its PREA initiative to interview staff at correctional facilities across the country.

This bulletin, the second in a series on sexual violence, focuses on investigations. It presents staff perspectives on barriers to identifying and investigating sexual assault, education and orientation needs, investigative techniques, and recommendations for improving investigative responses to PREA issues. These ideas and recommendations will assist agencies as they develop strategies to address sexual violence in our nation's correctional institutions.

**Morris L. Thigpen, Sr., Director**
**National Institute of Corrections**

On September 4, 2003, President George W. Bush signed into law the Prison Rape Elimination Act (PREA), the first piece of federal legislation in the nation's history to address sexual assault in correctional settings. PREA requires the National Institute of Corrections (NIC) to provide the corrections field with information and technical assistance in the areas of prevention, investigation, and sanctioning.

As part of its response to this mandate, NIC, in cooperation with The Moss Group, Inc., conducted a series of focus groups with prison and jail staff to collect their perspectives regarding inmate-on-inmate sexual violence in correctional facilities. A total of 332 staff were interviewed at 12 sites across the country representing local, state, and federal facilities, including privately managed facilities. Participants included executives, mid-level managers, line officers, and administrative and support staff.

Focus group participants responded to questions regarding the problems they encounter in preventing or responding to an incident and described any successes their agencies had addressing the issue. Questions regarding the dynamics of inmate sexual violence explored what the participants knew generally about sexual assault, what procedures had been put in place, and what training they had received. These discussions yielded comprehensive information directly from the field about staff attitudes, knowledge, and current practices. This information will assist agencies as they create training and education programs, develop policy, and design prevention and intervention strategies.

This bulletin is the second in a series that summarizes the findings of the focus group interviews.[1] It reports staff perspectives on investigations, a critical issue

---

[1] The first bulletin in the series, *Trends from Focus Group Interviews,* presents an overview of the research findings (see "Resources," page 19). Subsequent bulletins will report staff perspectives on women's issues, concerns specific to jails, correctional culture, and matters relating to prosecution.

**U.S. DEPARTMENT OF JUSTICE**

**NATIONAL INSTITUTE OF CORRECTIONS**

Morris L. Thigpen, *Director*

Thomas J. Beauclair, *Deputy Director*

Dee Halley, *NIC Program Manager, PREA*

*Principal Investigators*

Barbara Owen, Ph.D.

James Wells, Ph.D.

*Authors*

Barbara Owen, Ph.D.

Susan W. McCampbell, MCRP

James Wells, Ph.D.

*Research Team*

Calvin Brown

Yvonne Saunders Brown

Maureen Buell (NIC)

Marianne McNabb

Marcia Morgan, Ph.D.

Barbara Owen, Ph.D.

Diane Schlachter, Ed.D.

James Wells, Ph.D.

*Project Director*

Anadora (Andie) Moss
*President, The Moss Group, Inc.*

Prepared Under Cooperative Agreement No. 05S18GJI0

By National Institute of Corrections and The Moss Group, Inc.

in improving the correctional response to sexual assault. The bulletin enumerates the current barriers to effective investigations of both inmate/inmate sexual assault and staff sexual misconduct and offers specific recommendations for improving investigations. These include developing protocols, educating inmates about how to report an incident of sexual violence effectively, establishing specialized training programs for staff at every level, and collaborating closely with prosecutors and community agencies. Other topics covered include the cultural and social climate of the institution, leadership issues, the need for more resources, and outside factors affecting investigations, such as reluctance to prosecute cases and public attitudes.

## Executive Summary

Most respondents asserted that they take sexual violence in their work setting very seriously. Although most said they had little direct personal knowledge of sexual assault and other forms of sexual violence in their facilities, most also believed that sexual assault occurred more than they knew. The focus group interviews yielded significant information about investigating sexual assaults in correctional facilities. Analysis of the respondents' comments identified the following key themes:

- Multiple barriers to identifying and investigating sexual assault.
- The complexity of these investigations.
- Elements of effective investigations.
- Recommendations for improving the response to sexual assault.

### Barriers to Identifying and Investigating Sexual Assault

Staff agreed that all reports of sexual violence should be investigated. At the same time, they described multiple barriers to effective investigations, notably:

- Difficulty discerning the nature of the sexual act.

- Inmate reluctance to report incidents and a lack of witnesses. Although some of the inmate reluctance to report or to cooperate with investigations stems from elements of inmate culture, some staff suggested that it is caused by an inappropriate and noncompassionate approach to inmate interviews.

- Changing stories and noncooperation, often confounded by difficulties in obtaining physical evidence, particularly when reports were not made in a timely manner.

- Difficulty in validating claims due to lack of evidence.

- Inadequate protocols and lack of training in investigating prison rape and sexual assault.

- Confidentiality requirements.

- Inadequate resources to pursue allegations.

Focus group participants discussed in detail the challenges of prosecuting inmate/inmate sexual assault. Difficulties in prosecuting staff sexual misconduct were also described, but much less frequently. Respondents said that in some jurisdictions, correctional facilities cooperated closely with the local prosecutor's office. In others, the prosecutors were unwilling to prosecute inmate assault cases aggressively, particularly if the evidence was weak, the inmate victim appeared blameworthy, or there was a lack of interest in prosecuting prison- or jail-based cases. There was no consensus as to the effectiveness of using internal versus external investigators. Many staff believed that outside investigators were not trained to investigate institutional assaults effectively.

### Complexity of Investigating Sexual Assaults in Correctional Facilities

Focus group participants said investigations of sexual assault were complex and required significant resources. They attributed this complexity to several factors, including:

- The effect of the culture and social climate of an institution on reporting and investigating.

- The fact that sexual assault is more of a power issue than a sexual issue.

- The potential for inmate manipulation of the system.

Staff sexual misconduct was perceived as adding to this complexity. Focus group participants observed that:

- Staff may be reluctant to report because of the "code of silence."

- Staff sexual misconduct may be more associated with female facilities, but it occurs throughout corrections.

- Specialized training is needed to investigate staff sexual misconduct.

### Elements of Effective Investigations

Staff cited factors that contributed to successful investigations, including:

- Respect for inmates' privacy and safety needs.

- Rapport with inmate victims, assailants, witnesses, and potential predators.

- Solid understanding of the dynamics of inmate sexual violence.

- Timely response.

- Coordination and collaboration among the departments in the facility.

- A system for tracking victims and assailants throughout their incarceration.

- Partnerships with outside agencies such as hospitals, rape crisis centers, prosecutors, and state police.

- A staff position dedicated to managing safety issues pertaining to sexual violence.

- Regular communication and interaction between custody and noncustody staff.

- Trained investigators.

- A written investigative policy with medical and mental health protocols.

### Recommendations for Improving the Response to Sexual Assault

The focus groups made the following recommendations for improving correctional institutions' response to sexual assault:

- Creating and enforcing policies for prevention, investigation, and treatment.

- Taking all allegations seriously.

- Cooperating with prosecutors.

- Partnering with community agencies in investigating and prosecuting sexual assault.

- Developing specialized training programs for responding to sexual assault and conducting investigations in correctional settings.

- Providing inmates with ongoing education about how to protect themselves and report sexual assault.

- Creating and expanding opportunities for inmates to seek safety and report assaults privately.

- Developing or increasing sanctions for inmates who harm others or who make false reports and for staff who are involved in sexual misconduct.

## Inmate-Related Issues in Investigating Sexual Violence

The focus group participants described a range of inmate-related challenges to effective investigations, including:

- The difficulty of determining the nature of the sexual act.

- Characteristics of specific inmate groups.

- Lack of inmate cooperation.

- Difficulties in obtaining evidence.

- Inmate fear of retaliation.

- Inmate lack of confidence in the investigative process.

- False allegations.

- Differences in working with male and female inmates.

The focus group findings on each of these topics are discussed below.

### Determining the Nature of the Sexual Act

Throughout all the focus group interviews, participating staff indicated that identifying inmate sexual assault was itself a complex issue. Staff participants listed many problems related to discovering that a sexual assault had occurred, whether it be an inmate/inmate assault or staff sexual misconduct. Chief among these barriers was the difficulty of discerning which sexual relationships were consensual and which were coerced. Staff said this difficulty in determining the origin and nature of sexual acts was a key barrier in responding appropriately to sexual assault. As one staff person noted:

> One of the hard things about this issue is that one does not want to get involved in a "lover's spat," but, at the same time, you have to try to take all claims seriously. . . . [I]t is hard to determine the real issues; it is not always rape, but it always needs to come to custody's attention.

Staff felt that inmate/inmate sexual contacts that initially were consensual might come to be perceived by one of the inmates as coerced for a variety of reasons, such as feelings of shame after the initial act, embarrassment, or worry at being discovered by other inmates, fear of disapproval by staff or family members, and discomfort with the behaviors themselves.

Staff may not be certain about the formal distinctions between a consensual act or relationship and one that is forced or coerced as defined in the PREA legislation and in the more recent Bureau of Justice Statistics (BJS) definitions, state law, and agency policy. This point of view is expressed in the following comment:

> [While we may] believe that it is consensual sex—not to say that anyone in this institution believes that is

> O.K.—but they may be reluctant to report it if it appears to be consensual. Staff may be confused about what is really going on. If there is no [obvious] injury, then is it an obvious rape?

Focus group participants said that the ability to promptly determine the truth of allegations is essential to determining whether a crime has actually occurred or the allegation has been made for other reasons. Participants consistently indicated that answering this question was the first step in an effective investigation.

Assaults involving violence seemed to be clear-cut cases for the staff respondents, but as one person noted: "The consensual act is a totally different issue—it is hard to know about and [thus] hard to respond to."

The respondents said that successful investigations are based on a solid understanding of the dynamics of inmate sexual violence and other aspects of prison life. Staff stated that the complexity of inmate sexual relationships often made reporting problematic. In both male facilities and female facilities, many staff linked sexual assault to "a relationship gone bad" or a "falling out" in a relationship that was initially consensual.

### *Characteristics of Specific Inmate Groups*

Participating staff identified characteristics of specific inmate groups that contributed to the difficulties in determining whether sexual activity was consensual or coerced. The homosexual inmate population was one such group:

> Take someone with homosexual tendencies. It is hard to tell if they "want it." Maybe they want to be in with the boys [so they engage in sex]. They will be where they can get hit on. It is more difficult (not as obvious) for someone who does not want to be hit on.

However, other inmate groups were found to pose greater challenges. Staff had particular difficulty determining the facts when mentally ill inmates—particularly those who were delusional or paranoid—reported sexual assault. As this staff person said:

> One of the biggest issues is that mental health inmates have in the past lodged allegations against other inmates that seem unrealistic and bizarre. Whether they are or are not, we still respond and don't say it is ridiculous [and we take them seriously]. It is important that it is managed carefully.

One focus group participant described a mentally ill inmate who needed reassurance because he had been victimized in the past:

> An inmate came to me once, and he told me that he had been raped [in the past]. And he wanted to make sure that we had it on file so he would not run into [the perpetrator] again. I looked it up, and there it was in the file. He was a mental health case, and I tried to put him at ease.

Staff who work in female facilities reported problems specific to discerning assault among female inmates. These problems included the more overt relational aspects of women's institutional behavior, the lack of physical evidence (semen) for inmate/inmate incidents, and the overall issue of staff sexual misconduct.[2] Younger inmates and those with physical disabilities were also mentioned as presenting specific challenges in investigations of sexual assault.

### *Lack of Inmate Cooperation*

The lack of inmate cooperation with investigations was a central concern among the staff respondents,[3] who cited the following issues most often:

- Inmates' lack of knowledge about how to report a sexual assault.

- Inmates' reluctance to inform correctional authorities about incidents of sexual violence.

- Inmate credibility.

---

[2] Issues specific to female inmates and facilities will be addressed in volume 3 of the Staff Perspectives series.

[3] For more detail on staff perceptions of the complications surrounding inmate reporting of sexual violence, see volume 1 of the Staff Perspectives series, *Trends from Focus Group Interviews.*

Some staff suggested that inmates could be reluctant to discuss a sexual assault incident with staff members they deemed unsympathetic to their situation. Emotions such as guilt, shame, embarrassment, and humiliation after experiencing a sexual assault also contribute to inmate reluctance to report, according to many staff participants. As one respondent suggested, "Inmate victims are sometimes confused and unclear about the role they may have played in their own victimization." This was particularly true, the respondent continued, when they "have been victimized so long . . . throughout their lives [and] do not know what normal touch is."

Another staff participant stressed the need to develop rapport with inmates:

> You can't just ask an inmate point blank if he has been assaulted. Part of the job is building rapport with inmates. You have to lead up to these questions. The inmate will hide and deny [that he/she has been assaulted]. But sometimes you can see physical signs of violence.

Distinguishing between consensual and coerced acts can add another level of complexity to inmate reporting issues. One noncustody staff person said:

> [I]t is hard to know because after they report the incident, a victim will change his mind and [recant] and say it was consensual.

### Difficulties in Obtaining Evidence

Staff described difficulties in obtaining physical evidence, particularly when reports were not made in a timely manner. Collecting physical evidence was identified as a particular problem in assaults involving female inmates.

Once a report has been made, problems with the preservation of evidence can be a significant barrier. Staff stated that reports are often unsupported by physical evidence, witness statements, or identification of the alleged perpetrator.

Staff said that many inmates are not aware of the importance of preserving evidence and may take a shower and dispose of clothing or other physical evidence. As one officer explained, "They get rid of this evidence because of their shame [over the assault] and ignorance [of the need to collect evidence]."

It was also frequently suggested that when inmates do report an assault, they may refuse to submit to a medical exam or may recant their statements during the investigation. Often this refusal to cooperate in the investigation is tied to another aspect of inmate culture, the fear of retaliation.

Although staff in every facility mentioned the need to treat "every allegation as valid until proven otherwise," problems related to inmate reporting were perceived to be among the most significant barriers to effective investigation. The participants suggested two reasons inmates may be reluctant to report sexual assaults: feelings of shame and humiliation at being the victim of such an assault and the constraints imposed by inmate culture.

Another barrier to obtaining evidence was inmates' tendencies to delay reporting. As one participant suggested, it can be "difficult to determine which claims are real because they won't report till after a month or so from the incident." Even those who present obvious physical evidence of a violent assault may be reluctant to admit they have been victimized. Staff suggested that alleged victims often refuse medical or mental health care, including evidence collection procedures such as the "rape kit." In most systems, inmates are allowed the right to refuse medical treatment and are not obligated to cooperate with the investigation.

In the incident described below, a multiperson cell compounded the problem created by a reporting delay:

> [It is hard to determine one perpetrator] when two inmates [are implicated]. There were eight [inmates] in the cell, and all seven were listed as suspects. Six or seven hours passed until he made the report. [The delay made the] collection of evidence difficult. We took [the alleged victim] to [an outside hospital], but he declined [the examination]. We indicated "not desired" when we submitted the report.

Crime lab delays can further stymie investigations, as expressed in this comment by a line staff member in a very large male prison:

> Evidence is sent to the [state lab], and it usually takes 1½ years to get reports back. You can't do anything until the evidence comes back.

There was agreement across most participating facilities that systems for investigating assaults could be effective once an inmate report was verified or physical evidence collected. Participants in all focus groups recommended improving reporting mechanisms, as expressed in the following comment:

> We need some better way to report that makes it easier for inmates to come forward and then [need to support] them afterwards. The followup is tough on inmates that report.

### Inmate Fear of Retaliation

> Inmates worry about retribution. We need a system that allows the inmate to come forward, so that inmates see that someone who claims rape is protected. This will discourage retribution.

Staff at all levels agreed that inmates are afraid to report that they or others had been assaulted because they feared retaliation by the [alleged] perpetrators or other inmates who objected to "snitching." One investigator described this by saying, "If [the] inmate and I leave the pod, others will think he is special and a snitch or getting sympathy, etc. . . ."

In every facility, staff stated that inmates who reported any kind of sexual assault perceived themselves to be vulnerable to further violence. As this participant said:

> Everyone notes when the investigation team comes out. If a certain inmate is talked to by the team, then other inmates make assumptions and can potentially revictimize that inmate.

Said one correctional officer participating in a focus group:

> Nothing gets reported because of the threats. It would be important to educate inmates at orientation. But the inmate culture suppresses reporting. If you are a known victim, then you can become a [repeat] target.

Another correctional counselor agreed:

> Amongst the population here, the culture tells them who they speak to, and if they don't follow it, it can come back to bite them.

### Inmate Lack of Confidence in the Investigative Process

Focus group participants said that many inmates were reluctant to report sexual assault because they were skeptical about the system's ability to improve their circumstances. Staff said the entire process is undermined when inmates do not receive assistance—or still feel endangered—after they report an assault. This comment from an executive manager of a small state prison reflects this view:

> Two years ago, a CO [correctional officer] was doing rounds. An inmate predator was caught in the act with a smaller inmate. We thought of it as consensual. The inmates were separated. The case went to a hearing. The powerful inmate said that the CO did not see it all. But he pled guilty. The victim was not talking much; he was trying to hide it. They were sent to a different facility. Eventually, both of the inmates ended up in the same facility. I wondered if anyone had tracked these inmates. I wonder, are we continuing to do the right thing? The victim from this incident [was revictimized by the process itself].

Both custody and treatment staff said that some investigators seemed focused on "proving the assault was the offender's [the inmate victim's] fault" or that the act was consensual and thus not a reportable incident. As one social worker said, "Because of the pressure of the investigation, inmates often recant. The inmates say, 'They're [the investigators] making it feel like it's my fault.'" This, too, said staff, undermines inmates' confidence in the system.

Some staff described "insensitive" supervisors who solicited witnesses by asking the entire cell, "Did you see anything?" and "fronting off" the victim in front of other inmates. Staff expressed concern that such an approach further victimizes the inmate by exposing the situation to the rest of the inmate population.

The focus groups agreed that protecting victims from both subsequent assaults and retaliation was central to their work as correctional professionals. Although most staff agreed that inmates who have information about the assault might be reluctant to come forward as formal witnesses, one staff member observed that inmates "can help you out with information as long as you don't make them a witness. They will tell you things because they don't want disharmony in the cell."

The focus group respondents made numerous recommendations for improving the process of inmate reporting, including:

- Increasing confidential and safe options for reporting.
- Making information about how to respond to sexual assault readily available through inmate orientation and handbooks.
- Exploring technology to improve reporting.
- Involving mental health and other treatment staff.
- Implementing an ombudsperson program to assist inmates in reporting.

A correctional officer at a maximum security facility suggested a phone hotline to ensure confidentiality and safety:

> How about a way to confidentially contact someone about the abuse?—a hotline that [could] be tied into internal investigators. The inmates need a safe way to report, like hotlines on [the] street. There are hotlines for sexual mistreatment by staff; use the same method for inmates. Reporting assault is very sensitive. They need more safe places to report. The medical offices, the mental health offices—they are safe places. You can observe their [the inmates'] blank eyes, and you know something is going on.

Some focus group participants felt that inmates were more likely to report these incidents to noncustody staff. In one facility, a respondent said that inmates had a strong rapport with their medical and mental health staff. In his facility, custody staff worked collaboratively with these departments. In another facility, a program manager from a small state prison said, "We have good support with medical and mental health. We are not afraid to go to mental health because they respond. No one is afraid to call someone here and report a situation." A medical manager suggested:

> Reporting is an issue. The inmates may tell a CO that "I am worried, I need to talk to mental health," but they won't report it to custody staff. Inmates can tell medical or mental health personnel about certain inmates and problems they may be having. The inmates notice when ISU [Investigative Services Unit] walks on the yard. The staff gossips too.

> As a medical person, I have to walk a fine line between the interests of the custody staff and the inmates. You want to limit the general knowledge as much as possible. We need a safe reporting system that has two tracks: one for treatment with the medical and mental health staff and one with custody for investigation and evidence.

### False Allegations

> So where does this start, and where does this end? We had an offender popped on the butt with a towel, and now he is claiming sexual assault and protection. Inmates will manipulate any system for their own gain.

Officers indicated that inmates will use claims of sexual assault against other inmates that they "don't like" or "want to get into trouble," or as "leverage for something else." These false accusations are frustrating to staff because they create additional investigative work on a claim that is difficult to substantiate even when valid.

All participating facilities identified "not knowing the validity of inmate stories" as a problem. Comments about inmates "changing their story" or refusing to testify against other inmates were frequent. One captain said:

> We had an inmate homosexual claim rape. . . . We went through the whole procedure . . . transport, rape kit . . . and then when we put him in protective custody, he . . . claimed it was consensual. . . . He would not press it any further. . . . They deny it.

As one member of an executive team in a jail noted:

> The drawback was that there was so much work to check the validity of a complaint. There were so many false positives that there was no faith in the system.

Many staff expressed serious concern about the possibility of "inmate manipulation" of the investigative system. As one correctional officer observed:

> The legitimate cases of rape don't get reported as much as the false allegations. We waste our time a lot when inmates cry rape to go for a ride [to an outside clinic].

The respondents detailed many ways inmates could use the reporting system to gain some advantage, such as revenge against other inmates and staff, a transfer or change to more desirable housing, or the opportunity to make a claim for compensation. As one officer from a very large medium-security facility remarked:

> Inmates may report that they were assaulted to get out of a cell. It is not easy to distinguish between a real incident and inmate manipulation to gain a cell change or reporting it to get other inmates in trouble. It is hard to know what is happening in here.

Another staff person said:

> They [inmates] are using it [the policy of full investigation] to their advantage right now. [Imagine] the money involved [in pursuing] false allegations with no merit. By the time we get to the investigation, we find that out [that it is a false allegation]. Biggest obstacle—convicts know they can use this tool to manipulate [the] system.

In the same focus group, another respondent disagreed with this assessment, saying:

> Maybe the new inmates [are out to manipulate this system], but not the old timers. The money [on these investigations] is well spent because if I was in prison, I would not want to be raped. You can't spend too much money to prevent it.

Most participants agreed that all allegations should be investigated. Others, however, expressed concern that addressing false allegations required significant resources, sometimes diverting resources from valid claims. Other focus group members asserted that investigators must be objective, even in the midst of an organizational culture that encourages disbelief of offender allegations. One staff person admitted, "An offender claimed he was assaulted in the shower. I knew that it did not happen, but we had to write our documentation anyway."

Despite the possibility of false reports, correctional staff affirmed their commitment to responding to all inmate claims of assault, as expressed in the following comment:

> Inmates do have manipulative behavior, but I do not believe that inmates have to be abused here. They are already being punished.

The need to investigate any and all assaults was discussed in the majority of the focus groups. Regardless of the outcome, many focus group participants agreed with this view:

> If they allege [any assault], we have to put the effort into investigating it. Whether it is inmate manipulation or not, it is important to use all our investigative procedures to prove any allegations.

### *Differences in Working With Male and Female Inmates*

The focus group interviews also produced information about the differences between male inmates and female inmates with regard to inmate reporting and to investigating and prosecuting incidents. Variations in the ways women and men adjust to a correctional environment were said to contribute to these differences. Staff working in female facilities noted several specific differences in investigating sexual assaults in these facilities. These included greater concerns about staff sexual misconduct [4] and differences related to female inmates themselves,

---

[4] Staff sexual misconduct is most often identified with female inmates, but recent findings by the Bureau of Justice Statistics show that numerically, male facilities report the most staff sexual misconduct (Beck and Harrison, 2006). Of course, this finding is grounded in the fact that more than 90 percent of all correctional facilities house male inmates.

notably, difficulties in collecting physical data; the "more obvious" relationships between female inmates, which complicate investigations; and a willingness to "tell" about alleged incidents.

## Staff Barriers to Investigations

Focus group participants described staff-related barriers to effective investigations in great detail. These included:

- Ineffective investigations and investigators.
- Lack of confidence in the process.
- Issues related to who conducts the investigation: staff or an outside agency.
- Confidentiality issues.
- The need for more education and training about investigations.
- Lack of investigative protocols.
- Lack of collaboration.

The focus group findings on each of these topics are presented below.

### *Ineffective Investigations and Investigators*

Focus group participants offered many observations about the quality of investigators and the position of investigator in general. Although not all focus groups discussed these issues, participants in groups that did expressed strong views.

Some respondents said that understanding the unique nature of investigations inside a correctional facility was very important to the success of an investigation. Staff in one facility cited a case in which the investigator "came in and asked a whole housing unit of inmates if they had witnessed an assault" as an example of ineffective interviewing. One participant observed that investigators often do not treat the reporting inmate as a victim, an approach no longer tolerated in sex crime investigations in society at large. Other respondents noted that both internal and external investigators may have had little experience in investigating sexual assault and that this lack of experience compromised the effectiveness of investigations.

At many focus group sites, staff said that supervisors had primary responsibility for investigating inmate sexual assault and staff sexual misconduct, as illustrated in this comment:

> This jail has gone a long way to stop that behavior. There are other investigations and medical help offered to the inmates. We do the groundwork and pass the information on and funnel everything up the chain, and they [the supervisors] take over.

Other correctional staff with law enforcement backgrounds suggested that their experience was helpful in investigating sexual assault:

> [When there is an allegation or suspicion], I am going to start thinking like a cop—I was formerly a deputy sheriff, so I am going to say, if there is something like that, aren't they going to want to do an investigation? [From my past experience, I know] you should secure the area and not let anyone near it.

Some jail facilities rotate staff between correctional and law enforcement positions. Focus group participants in such facilities reported that their training includes crime scene investigation and responding to sexual assault because they are trained to work both in the jail and "on the streets." In these facilities, both line staff and managers said that line deputies are "eager" to conduct investigations and use these skills:

> The patrol deputies get domestic violence and rape training. In the last 8–10 years, the emphasis is that rape is a violent, not sexual, crime. The deputies are taught compassion. In the field, sexual assault is handled by female officers, but sometimes males are more compassionate.

> We have had some training on sexual assault—most has been about investigations of assault on the street. But we can take that training and apply it here [in the jail].

A jail supervisor described his agency's response to sexual assaults as follows:

> Every time an incident occurs, all processes kick in. Director knows about it. There is a 24-hour reporting system, so we get a phone call. There are better investigations with more eyes watching you.

### Lack of Confidence in the Process

Some staff expressed an overall lack of confidence in the investigative process, a view attributed to most inmates as well. This lack of confidence leads some staff to avoid formal procedures for reporting and investigating sexual violence, as shown in this comment from a correctional officer: "If I have a problem, I take it into my own hands. If you have good interpersonal communication skills, you can handle it." Other staff gave "not trusting the process" or "covering themselves" as reasons for conducting their own "investigation" into allegations. This was more often mentioned in cases of staff sexual misconduct.

Many participants cited reports of sexual assault or misconduct that the "higher-ups" in their facilities had discounted. Some staff said they do not report sexual assault or misconduct because they are concerned that the report will "end up in the trash."

Operational issues such as discrepancies between formal organizational policies (e.g., post orders) and the "supervisor's rules" also were cited as reasons for nonreporting. Some respondents noted that a lack of communication within the organization and a lack of knowledge about how to write a good report kept some employees from reporting.

A small number of focus group respondents said that they had inadequate knowledge of or training in the formal reporting procedures in their facility. Others claimed that their facility had no specific policy or procedure for reporting and investigating sexual assault. In these few facilities, staff indicated that they thought the procedure for investigating sexual assault was the same as the procedure for investigating any other type of assault. In response to a question about staff knowledge of procedures, a supervisor in a medium-sized jail responded that post orders "never cover this kind of thing." A line deputy from a large county jail said, "[We have] no special procedures." When asked about inmate education in reporting sexual assault, a counselor working with female inmates said the orientation material "probably doesn't say 'If you have been raped, call a correctional officer.' It is more general [about reporting all kinds of assaults]."

Inadequate investigative protocols were said to create a barrier to inmate reporting. One focus group participant noted that the reason for the low percentage of allegations found to be true was not that the incidents did not occur, but that the facts were hard to prove.

A variation on the problem of lack of confidence in the investigative process was described by participants who claimed that their facilities' response to sexual violence was internally inconsistent. One participant said, for example, that those working on other shifts in the same facility may handle allegations of sexual assault differently.

There was agreement among most participating facilities that systems for investigating assaults could be effective once an inmate report was verified and physical evidence collected. As one supervisor noted, "Reported rapes are easy to investigate, but we don't sit and ask questions for two and a half hours to determine if something has happened if no one comes forward."

### Issues Related to Who Conducts the Investigation

Focus group participants outlined two basic approaches to investigations. Some agencies rely on their own staff to investigate sexual assault, while others refer investigations to law enforcement such as the state police or the local county sheriff. Many staff expressed the belief that outside investigators cannot investigate institutional assaults effectively because they lack experience with the correctional environment; others said that facility staff were unable to investigate such incidents objectively.

Participants said the perceived seriousness of the incident determined whether law enforcement would be brought in to investigate:

> Initially [when] we get information from an individual, investigations are handled one of two ways. If the inmate-to-inmate charge is perceived as a felony, it gets reported to law enforcement. All staff/inmate allegations are reported. Lesser types of allegations are handled in house.

Some participants said that the type of reported assault determined the type of investigation:

> I staff the incident with the chief. . . . [W]e open an investigation with Internal Affairs, and it is up to the detectives to investigate. We do it internally unless we feel we need to go to the county attorney's office. With custodial sexual misconduct, we do it internally. If a crime is being alleged, like a rape of [an] inmate by [an] inmate, we would probably ask for assistance. Our response is immediate. If we get inmates who say they are being sexually abused, we are going to take care of their needs, protect them. It is not going to take months; it will be taken care of immediately.

The focus group participants said that information exchange was a fundamental issue when using staff to investigate. Some said that having staff conduct the investigation compromised confidentiality and that they would prefer the involvement of a "more objective" outside agency. Many of the participants who objected to internal investigations cited lack of formal protocols and experience. Other objections to using staff to investigate incidents were "favoritism" and lack of professionalism.

Some focus group participants said that internal investigations are perceived to be "less credible." At the same time, participants from smaller agencies stated that they needed help from either a larger organization or an outside agency to investigate allegations because of their lack of resources.

The lack of confidence in internal investigations was voiced in the following comment regarding staff sexual misconduct:

> If you get real investigators in here, things might be different. I don't know why they don't get real investigators here.

> I worked five years in investigation. Internal Affairs is determined that you are guilty at any cost, and they can ruin your good name. It should all be confidential, and it is not. [Any investigation] automatically assumes you are guilty. For every ten accusations, you find out three are truthful. Then you have seven people who are labeled as predators, and that is totally wrong. Investigations should be confidential; they should be more subtle and be taken to Central Office. It gives the wrong message when staff are falsely accused.

Some of the participants whose facilities used outside investigators saw these investigators' lack of knowledge about the dynamics of offender/offender and offender/staff relationships as an impediment to a credible investigation. Respondents said it was essential that investigators understand the following:

- The dynamics of sexual assault in a correctional setting.
- The correctional culture, including correctional "lingo" and acronyms.
- Internal correctional protocols.

Unsympathetic treatment of inmate victims was another problem associated with outside investigators. One health services administrator said, "I was very upset with how the state police handled it [an investigation]. They treated the victim like he was a perpetrator."

### *Confidentiality Issues*

Many staff reported that confidential information often became part of the "rumor mill," complicating the investigation. These rumors undermined investigations of both inmate/inmate assault and staff sexual misconduct. As one correctional officer noted, "There is no confidentiality here. . . . Everyone knows. If you report to a supervisor, everyone knows."

On the other hand, staff objected to some of the limits imposed by confidentiality. Some respondents said that the confidentiality requirements of investigations, and, in some cases, of medical or mental health processes, limited access to information for the line staff who

originally reported an incident. Many staff expressed significant frustration about not knowing the progress or the results of an investigation. They recommended that all staff and inmates involved in any investigation be provided with as much information as possible throughout the investigation, including information about the investigation's outcome.

Staff said that the lack of information about the results of an investigation was a factor that discouraged inmates from reporting staff sexual misconduct. In some facilities, staff felt that inmates knew that reporting staff sexual misconduct was futile. A staff member in a women's facility commented:

> The girls who are reporting incidents don't know [what happens to the accused staff member]. They [the women making the accusation] have a right to know what happened to their allegation, and [all the] staff have a right to know.

Some respondents expressed the view that "guilty staff" often "get away with it." In many focus groups, staff said that those accused of sexual misconduct were often transferred or terminated rather than prosecuted.

### Need for Education and Training in Investigation

Participants suggested that education and training for all staff at every level and for any other agencies working in these facilities was a primary means of removing barriers and improving investigations. Many staff suggested training for all employees (including noncustody staff, contract workers, and volunteers) about "what to look for and how to report." Custody staff observed that offenders at times report to noncustody employees because they consider these employees to be less threatening. One participant noted, however, that without adequate training, noncustody employees might not know what to do or might believe that their professional obligation of confidentiality precludes them from reporting the incident.

The focus groups were specific in their recommendations for improving training. Such training, they said, should be provided both for new employees and for all staff on an ongoing basis and should include specialized training for investigators. Respondents also suggested the development of specific training for those in specialized positions (e.g., medical or mental health services staff).

The training topics identified included:

- The security implications of failing to report allegations.
- Signs and symptoms of sexual predators and potential victims.
- The dynamics of sexual assault in a correctional environment.
- How to report.
- Report writing.
- Training for prosecutors.
- Interpersonal communications.
- "Demystifying" the investigative process.
- Classification systems.
- Skills for first-line supervisors.
- Policies and procedures.
- State law.
- Responding to allegations.
- Special populations (e.g., gangs, people with mental illness).
- Gender differences in inmate behavior.

Respondents also spoke to the need to educate community partners, including locally elected officials, local law enforcement and state police, insurance carriers, prosecutors, and victim services providers. Recommended training topics for these outside partners included:

- The dynamics of sexual assault in a correctional setting.
- Investigative protocols for reporting and investigating assaults.

- The importance of timely and impartial investigations.
- The differences between institutional and "free world" investigations.

The following training topics were recommended for investigators:

- Being proactive (e.g., building relationships before a crisis occurs).
- Knowledge of classification systems.
- Working with vulnerable victims.
- How to access the history of an offender's current and past incarcerations.
- The links between sexual assault and extortion.
- The use of technology and covert surveillance techniques.
- Centralized reporting.
- Collective bargaining agreements and the impact of their provisions on the rights of employees under investigation.
- The use of case studies to increase capabilities and knowledge.

## Lack of Investigative Protocols

The absence of investigative policies or protocols was cited as a significant barrier to effective investigations. Focus group participants said the lack of formal protocols undermines the trust of offenders and staff in the investigative process. They made the following suggestions:

- Establish policies that allow employees and/or investigators to act quickly to preserve evidence and crime scenes.
- Consider policies that allow for the transfer of sexual assault victims or witnesses to other facilities to protect their safety and facilitate reporting.

- Identify potential predators and victims at intake.
- Provide checklists about sources of potential evidence of sexual assault.

## Lack of Collaboration

Most participants said that effective investigations required collaboration between staff throughout the facility. This included collaboration between line and supervisory staff, between all staff and investigators, and between custody and noncustody staff. Although many participants said that they felt investigators did not include them in the process, one investigator offered a different view:

> In my training, I tell the officers that they are part of my investigation. I tell them that I need their input. They are with the inmate day in and day out [so they know him/her better than I do]. [For example,] I ask them, Do you know this offender? They are part of the investigation. We do a lot of the training during turn out [roll call]. I tell them how important it is—this is our job. We are going to look for potential predators; we are doing our job.

Working as a team was said to improve both the credibility of investigations and their outcomes. In commenting on the need to collaborate with noncustody staff, one respondent said that "if the mental health providers and all female nurses that interface with staff and inmates worked together with the investigators, that would foster an environment where inmates would feel comfortable."

## Investigating Staff Sexual Misconduct

Staff in both male facilities and female facilities discussed staff sexual misconduct, but staff from female facilities mentioned this topic more often. Some issues in investigating staff sexual misconduct were similar to those in investigating inmate/inmate sexual violence. These issues included inmates' reluctance to report, inmate manipulation, and a lack of physical evidence. However, investigations of staff sexual misconduct present challenges specific to staff issues. The focus groups cited informal values about staff protecting other

staff, sometimes known as the "code of silence," as a significant barrier to investigations. As one participant observed:

> The staff know what is happening in the unit, but sometimes they have difficulties reporting on other staff. I always wonder, How can you know what is going on and not do the right thing? Usually, there are others involved—like as a lookout. There is also a code of silence. It took quite a while for staff who knew about a specific incident [in this facility] to report.

Participants, particularly male staff, expressed concern about the fact that inmates at times falsely accuse staff of sexual misconduct. They said that once an investigation was opened, the accused staff member was "guilty until proven otherwise." The stigma associated with the accusation could persist even after a staff person had been cleared of all charges and cause long-term damage to his/her career.

Respondents also said that learning about other staff being "walked off" as a result of inappropriate or criminal involvement with inmates served as an important lesson. One correctional officer commented:

> By seeing what happens to others who get involved with inmates, that is how I learn. . . . I learn by seeing consequences.

Other issues the focus groups raised specific to investigating staff sexual misconduct were:

- Concern about the status of the alleged perpetrator (e.g., friendships with superiors).
- Reluctance to report on a co-worker on the basis of a suspicion.
- Concern about being ostracized by other staff members for violating the code of silence.
- Fear of retaliation from the accused person or his/her defenders.
- A staff occupational culture and union rules that inhibit investigation.

Staff said that specialized training is needed to investigate staff sexual misconduct.

## Additional Issues Affecting Investigations

### Collective Bargaining

Focus groups also mentioned the impact of collective bargaining agreements and unions on investigations. Along with the "code of silence," unions were perceived by some as impeding investigations, as illustrated in the following comment:

> When dealing with an employee, and when you are positive something happened, you have to prove it. You can't just terminate somebody—which might be for the best. Internal Affairs even has their hands tied in an investigation because of the union rights. [The union limits] how much they can say. The person involved may appear to have more rights than the offender you are trying to protect.

In contrast, participants also reported that union officials claim they are protecting their members from incompetent or unfair investigations.

### Cultural and Social Climate of the Institution

Creating a culture in which staff and inmates are willing to report sexual violence was cited as a significant challenge.[5] At all 12 sites, participants spoke of the need to clearly establish a commitment to "zero tolerance" for sexual assault through training, offender orientation, and credible investigations. Other recommendations included:

- Focusing on prevention rather than reaction.
- Training employees to be more sensitive to sexual assault when inmates report.
- Educating the community about the commitment and resources necessary to operate a safe jail or prison.

---

[5] Cultural and social climate will be the subject of a forthcoming bulletin.

### Leadership

Both executive and line staff in the focus groups raised the issue of leadership. A manager at a large state prison said:

> It is leadership—in the unit or agency. [Our response team] is a multidisciplinary group of the organizational leadership in Central Office—medical, psychology, legal, treatment, plant, and operations. We get together and listen to what the wardens are telling us.
>
> It is a total agency focus and has been a success. . . . It works because wardens have been brought into [the] program. Every investigation can be critiqued by an administrative review panel or the organization's top leadership to determine if the investigation could have proceeded differently. . . . [L]eadership taking advantage of lessons learned, whether from the findings or the process, is critical to the future success of the organization in prevention and investigation. If the number of sexual assaults reported significantly increases, additional human resources will be needed to document, track, and investigate allegations. As awareness of this issue is raised, and more incidents are reported, there may be negative consequences for correctional administrators, even those trying to do the right thing.

Line staff at several focus group sites stated that their executive staff had provided proactive leadership in responding to sexual assault. In one large prison, a staff member said that his warden trained the entire staff in their policy and procedures regarding inmate/inmate assault. Another respondent said that the warden in his prison "set a day aside to bring in managers with more knowledge about sexual assault. He explained [our agency program]. He is investigating things differently—he has given us his tactics."

### Resources

Many participants, particularly those in smaller facilities, said they did not have adequate resources for an effective response to sexual assault. One correctional administrator made this comment:

> We need three investigators for 500 inmates. I have one. My fear of starting a new mandate is that we cover ourselves with completed forms that say we did it. The legislature needs to quit talking out of both sides of their mouths [and give us resources].

### Victim Services

Many staff respondents voiced their concern about the long-term impact of prison rape on the individual inmate and on the community. This impact, they said, was a compelling reason to provide comprehensive medical and mental health services to inmates who are victims of sexual assault. They also said that referral protocols should be part of the investigation process.

Focus group members at many of the 12 sites reported that in alleged sexual assaults involving inmates, both the reporting inmate and the accused perpetrator are taken to outside hospitals for examination. One participant said that an outside mental health contractor in charge of a sexual offender program provided victim services to inmates reporting assault in his facility. Many said community victim advocates are also called to provide services to these inmates.

One respondent from a jail site suggested that comprehensive victim services and a good relationship with local prosecutors were indicators of a successful sexual assault policy:

> We have a big victim advocate agency, and our county prosecutor is more than willing to prosecute. We send a good message to the inmates and the staff that we are going to pursue this.

The need for compassion toward inmate victims was mentioned at several sites. One manager commented:

> We do provide additional training in compassion in dealing with crime victims. We say, This is how you talk to inmates. This is how to show compassion for the victims of sexual assault.

### Inmate Education

Participating staff also discussed the need to educate inmates about reporting and investigating sexual assault.

As one counselor said:

> At the orientation for inmates, we need handouts on how to protect yourself, the consequences of being a perpetrator, and rape prevention. We need to educate the inmates about the expectation of reporting—we need to tell them that we expect them to report it.

Another staff person described the need to "make inmates aware [of] what's expected of victims when they report rape—that they will name names, have medical exams, a rape kit. I don't think they know what happens."

Focus group participants said offenders should be educated about all aspects of sexual assault, investigations, and treatment, including the definition of sexual assault, reporting procedures, the rules governing sex with other inmates, and polices about staff sexual misconduct.

### Other Recommendations

In addition to training and education, focus group participants recommended the following strategies for improving their agencies' response to sexual assault:

- Use of technology.
- Automation of records.
- Centralized reporting.

## Outside Factors

The focus group interviews identified two primary outside factors impeding investigations: a reluctance to prosecute cases and public attitudes.

### Reluctance to Prosecute Cases

Many participants asserted that local prosecutors were reluctant to take on cases involving both inmate/inmate sexual assault and staff sexual misconduct. This reluctance, they said, compounded the complexity of investigating such cases. Participants attributed the reluctance to prosecute to the following causes:

- Lack of local resources, particularly in small communities.
- Lack of enthusiasm for pursuing cases involving incarcerated populations.
- Difficulty in seeing inmates as victims, particularly inmates with long criminal histories and those convicted of sex crimes and violent offenses.
- Doubts about inmate credibility, particularly in cases of staff sexual misconduct.
- Belief that winning the case is unlikely due to the lack of credible evidence and testimony and the notion that jurors will be unsympathetic.
- Political motives.

A prison manager expressed these points by saying:

> The culture in the DA's office about prison rape is where corrections was 20 years ago. The community sees that sexual assault is somehow justified. Who cares about inmates when they have probably hurt somebody themselves?

### Public Attitudes

Staff respondents noted that the reluctance to prosecute may reflect the public's lack of knowledge, lack of empathy, or indifference toward criminals and corrections in general, attitudes shaped in part by:

- Popular media depictions of sexual assault in correctional facilities.
- The myth that inmate sexual assault is "normal" or "expected" in jails and prisons or "part of the price they pay."
- An overall lack of empathy for inmates as victims.

As an assistant warden from a large state prison said:

> The culture in the "free world" is like it used to be [in this department]. In the community, the grand juries see it as justice that a violent predator [inmate] was raped in prison—that is what is going to happen to them for what they did.

Partnering with and educating community agencies such as law enforcement, treatment services, and community

prosecutors were included among the elements of a successful investigation.

## Conclusion

The focus group data provide evidence that improving the investigative response to sexual assault in correctional facilities involves all aspects of operational practice. These data reflect multiple perspectives on investigating sexual assault in correctional facilities and show that improving investigations and prosecutions involves inmates, staff, and outside partners. Bridging the gaps between these spheres is a first step in reducing the harm caused by sexual violence between inmates and by staff sexual misconduct.

Staff recommended increasing options for safe and confidential reporting, developing and implementing sound investigative policies, training all staff in investigative protocols, increasing prosecutions, and increasing sanctions for false reporting. The need for inmate training, education, and orientation was mentioned in almost every interview. Inmate education should include information about institutional policy (including the agency's commitment to addressing sexual assault), staff readiness to assist inmates, avenues for reporting both fears and incidents, the investigation process (including timeliness and evidence preservation), and sanctions for false reporting.

Of particular concern to focus group members was the need to establish relationships with outside partners, whether the local sexual assault treatment center, the law enforcement agency that must conduct the investigation, or the district attorney responsible for prosecuting offenses. Partnering with and educating community agencies were identified as elements that contribute to the success of an investigation. Community education and public opinion were also seen as important.

Effective reporting and investigative procedures are critical to an improved response to sexual assault in custodial facilities. Through further analysis of the focus group data and other activities, the National Institute of Corrections will continue to provide research and technical assistance to meet this goal.

## ACKNOWLEDGMENTS

As The Moss Group, Inc., began work under a cooperative agreement with the National Institute of Corrections (NIC), our team felt a deep responsibility toward corrections professionals. *Issues in Investigating Sexual Assaults in Correctional Facilities* is the second in a multivolume series resulting from a major strategy designed to assess staff perspectives on the dynamics of sexual violence in adult prisons and jails. The first publication, *Trends from Focus Group Interviews,* is available at www.nicic.org.

Many individuals contributed to this project. At the top of our list is our research team led by Dr. Barbara Owen and Dr. James Wells. The team members were Calvin Brown, Yvonne Saunders Brown, Maureen Buell (NIC), Marianne McNabb, Marcia Morgan, Ph.D., and Diane Schlachter, Ed.D. During a 6-month period, members of our team conducted structured focus groups with all levels of correctional staff in adult prisons and jails. We are deeply thankful for their commitment, their willingness to be trained in a rigorous process, and for their patience in recording (verbatim) the comments of staff. We thank the 332 staff who participated in our project and the leadership of their organizations for cooperating so graciously throughout this endeavor.

We would like to give special thanks to Morris Thigpen, Larry Solomon, and Dee Halley for their untiring support for the many aspects of our work, and especially their willingness to support an extensive data collection effort. Maureen Buell of NIC was a team member on several of the site visits, and Alan Richardson of the NIC Jails Division was instrumental in numerous ways as we identified locations for the jail site visits. Special thanks also go to a group of reviewers including Aaron Aldrich, Les Dolecal, Gerald Gaes, Dee Halley, Bobbi Luna, Brenda V. Smith, Constance Taite, and Richard Tewksbury.

Finally, thanks to Dr. James Wells, who "crunched" the data and contributed greatly to the document; to Dr. Barbara Owen and Susan McCampbell, who were the primary authors of this work; and to Ania Dobrzanska, who was amazing in her ability to edit the document and push us to the point of completion.

# Resources

## Publications/Documents

American Correctional Association. 2004. *Performance-Based Standards for Adult Local Detention Facilities.* 4th ed. Alexandria, VA: American Correctional Association. Available at *www.aca.org.*

Beck, A.J., and P.M. Harrison. 2006. *Prison Rape Elimination Act of 2003: Sexual Violence Reported by Correctional Authorities, 2005.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. NCJ 214646.

Bureau of Justice Statistics. 2004. *Data Collections for the Prison Rape Elimination Act of 2003.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. NCJ 206109.

McCampbell, S.W., and L.S. Fischer. 2002. *Staff Sexual Misconduct with Inmates: Policy Development Guide for Sheriffs and Jail Administrators.* Washington, DC: U.S. Department of Justice, National Institute of Corrections, and Center for Innovative Public Policies, Inc. NIC Accession Number 017925. Available at *www.nicic.org/Library/017925.*

National Institute of Corrections and The Moss Group. 2006. *Prison Rape Elimination Act and Local Jails: The Facts.* Washington, DC: U.S. Department of Justice. NIC Accession Number 021455. Available at *www.nicic.org/Library/021455.*

National Institute of Corrections and The Moss Group. 2006. *Prison Rape Elimination Act (PREA): Considerations for Policy Review.* Washington, DC: U.S. Department of Justice. NIC Accession Number 021512. This document is designed to help agencies create the initial draft of PREA policies when requesting technical assistance from NIC. Available at *www.nicic.org/Library/021512.*

National Institute of Corrections and The Moss Group. 2006. *Trends from Focus Group Interviews.* Volume 1, Staff Perspectives: Sexual Violence in Adult Prisons and Jails. Washington, DC: U.S. Department of Justice, National Institute of Corrections. NIC Accession Number 021619. Available at *www.nicic.org/Library/021619.*

## Satellite/Internet Broadcasts

The following satellite/Internet broadcasts are available free of charge. Contact the NIC Information Center at toll-free telephone 800–877–1461.

- Facing Prison Rape, Part 1: "How the Prison Rape Elimination Act Affects You" (satellite/Internet broadcast, 2004). NIC Accession Number 019765. Available at *www.nicic.org/Library/019765.*

- Responding to Prisoner Rape, Part 2: "Assessing Your Agency's Response to Prison Sexual Assault" (satellite/Internet broadcast, 2005). NIC Accession Number 020158. Available at *www.nicic.org/Library/020158.*

- "Preventing Sexual Abuse of Children and Youth in Custody" (satellite/Internet broadcast, 2006). NIC Accession Number 021504. Available at *www.nicic.org/Library/021504.*

## Toolkits

The following toolkits are available free of charge. Contact Dee Halley, NIC Program Manager, at toll-free telephone 800–995–6423, ext. 40374, or via e-mail at dhalley@bop.gov, or the NIC Information Center at toll-free telephone 800–877–1461.

- Facing Prison Rape: Part 1. The 2003 Prison Rape Elimination Act (2004). An introduction for correctional administrators.

- Facing Prison Rape: Part 2. The 2003 Prison Rape Elimination Act (2005). Discussion points for anyone working within the correctional system.

- Speaking Up: Discussing Prison Sexual Assault, Male Version (2005). A toolkit designed to assist facility staff in educating male offenders on local sexual assault policies and practices.

- Speaking Up: Discussing Prison Sexual Assault, Female Version (2005). A toolkit designed to assist facility staff in educating women offenders on local sexual assault policies and practices.

- Keeping Our Kids Safe: The Prison Rape Elimination Act and Juvenile Justice (2007). A guide for juvenile justice administrators.

**U.S. Department of Justice**

National Institute of Corrections

*Washington, DC 20534*

Official Business

Penalty for Private Use $300

Address Service Requested

```
PRESORTED STANDARD
POSTAGE & FEES PAID
U.S. Department of Justice
Permit No. G–231
```

www.nicic.org

**July 2007, Volume 2**　　　　　　　　　　　　　　　　　　　　　　　　　**NIC ACCESSION NUMBER 022101**

## Agencies/Programs

**Bureau of Justice Assistance**
*www.ojp.usdoj.gov/BJA*
AskBJA@usdoj.gov
202–616–6500

**National Institute of Corrections**
*www.nicic.org*
800–995–6423
202–307–3106

**National Institute of Corrections/
Washington College of Law
Project on Addressing Prison Rape**
*www.wcl.american.edu/nic*
nic@wcl.american.edu
nicresearch@wcl.american.edu
202–274–4385

**National Prison Rape Elimination Commission**
*www.nprec.us*
nprec@nprec.us
202–233–1090

**Stop Prisoner Rape**
*www.spr.org*
info@spr.org
213–384–1400

### FOR MORE INFORMATION ON NIC'S PREA INITIATIVE:

Please visit *www.nicic.org/PREA* or contact:

**Dee Halley**
NIC Program Manager
National Institute of Corrections
320 First Street NW, Room 5007
Washington, DC 20534
E-mail: dhalley@bop.gov
Tel.: 800–995–6423, ext. 40374
Fax: 202–307–3361

**Anadora (Andie) Moss**
NIC Project Director
The Moss Group, Inc.
1444 Independence Avenue SE
Washington, DC 20003
E-mail: amoss@mossgroup.us
Tel.: 202–546–4747